Mr. Thomas A. Cloud Special Counsel, City of Winter Park Post Office Box 3068 Orlando, Florida 32802-3068
Dear Mr. Cloud:
You ask substantially the following question:
Is the City of Winter Park required to seek the approval of the Public Service Commission for the transfer of the electric distribution system assets in the city from Progress Energy Florida, an investor-owned utility, to the city?
According to your letter, the City of Winter Park (city) is undertaking the purchase of the electric distribution system assets located in the city from Progress Energy Florida (PEF), an investor-owned utility, pursuant to a purchase option clause in the franchise agreement between the city and PEF.[1] The current plan is for ownership and operation of the system to be transferred from PEF to the city on June 1, 2005. You state that the city is not constructing or purchasing a power plant or transmission facilities as those terms are defined in Chapter 403, Florida Statutes. However, the question has been raised whether the city must obtain the approval of a state agency prior to the transfer of the assets. You state that the city is of the opinion that such approval is not required. While your question is general in nature, your inquiry is primarily directed toward whether the city must seek the approval of the Public Service Commission.[2]
The powers and duties of the Public Service Commission (PSC) are generally set forth in Chapter 366, Florida Statutes. Section 366.11, Florida Statutes, provides certain exemptions from the PSC's jurisdiction, stating in part:
"(1) No provision of this chapter shall apply in any manner, other than as specified in ss. 366.04,[3] 366.05(7) and (8),[4] 366.051,[5]366.055,[6] 366.093,[7] 366.095,[8] 366.14,[9] and 366.80—366.85,[10] to utilities owned and operated by municipalities, whether within or without any municipality, or by cooperatives organized and existing under the Rural Electric Cooperative Law of the state, or to the sale of electricity, manufactured gas, or natural gas at wholesale by any public utility to, and the purchase by, any municipality or cooperative under and pursuant to any contracts now in effect or which may be entered into in the future, when such municipality or cooperative is engaged in the sale and distribution of electricity or manufactured or natural gas, or to the rates provided for in such contracts."
This office is not aware of any statute expressly requiring the city to seek the approval of the PSC for the transfer of the electric distribution system assets in the city from PEF to the city, nor has any such provision been brought to the attention of this office. In contrast, the Legislature in section 367.071(1), Florida Statutes, has specifically required PSC approval for the sale or transfer of water and wastewater system facilities.[11] A review of the PSC's rules also failed to reveal any provision imposing such a requirement on the city.
Rule 25-9.044, Florida Administrative Code, provides for notification to the PSC in the case of a change of ownership or control of a utility that places the operation under a different or new utility, but does not require approval by the PSC. Thus, for example, in In Re: Notice by ReedyCreek Utilities Company, Inc.,[12] the PSC was provided notice that the utilities company was transferring its electric utility assets to the Reedy Creek Improvement District and that the district had adopted the former utility's rates, classifications and regulations. The PSC's order merely acknowledged receipt of the notice; nothing in the order indicated that the commission's approval of such a transfer was required.[13]
Staff for the PSC have advised this office that the specific type of transaction described by the city, i.e., the transfer of the electric distribution system assets within a municipality from a regulated private utility to a municipality, has not been addressed by the commission. However, staff has not brought to the attention of this office any proceeding in which the commission concluded that the transfer of either all or part of the assets of an electric utility required approval by the commission prior to the transfer.[14]
As noted above, section 366.11, Florida Statutes, generally exempts utilities owned and operated by a municipality from the commission's jurisdiction, with certain exceptions. One such exception is the language of section 366.04(2), Florida Statutes, which provides:
"In the exercise of its jurisdiction, the commission shall have power over electric utilities for the following purposes:
(a) To prescribe uniform systems and classifications of accounts.
(b) To prescribe a rate structure for all electric utilities.
(c) To require electric power conservation and reliability within a coordinated grid, for operational as well as emergency purposes.
(d) To approve territorial agreements between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. However, nothing in this chapter shall be construed to alter existing territorial agreements as between the parties to such agreements.
(e) To resolve, upon petition of a utility or on its own motion, any territorial dispute involving service areas between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. In resolving territorial disputes, the commission may consider, but not be limited to consideration of, the ability of the utilities to expand services within their own capabilities and the nature of the area involved, including population, the degree of urbanization of the area, its proximity to other urban areas, and the present and reasonably foreseeable future requirements of the area for other utility services.
(f) To prescribe and require the filing of periodic reports and other data as may be reasonably available and as necessary to exercise its jurisdiction hereunder.
No provision of this chapter shall be construed or applied to impede, prevent, or prohibit any municipally owned electric utility system from distributing at retail electrical energy within its corporate limits, as such corporate limits exist on July 1, 1974; however, existing territorial agreements shall not be altered or abridged hereby."
Staff for the PSC have specifically referenced the provisions of section366.04(2)(c),(d) and (e). No information, however, has been presented to this office in the instant inquiry of any territorial dispute or that the transfer of ownership of electric distribution system assets involves the adoption or revision of a territorial agreement.
While section 366.04(2)(c) gives the PSC the authority to require electric power conservation and reliability within a coordinated grid, for operational as well as emergency purposes, I cannot conclude that this provision alone grants the PSC the authority to require approval of any transfer of electric distribution system assets to a municipality.[15] Similarly, while section 366.05(8), Florida Statutes, authorizes the PSC, to require installation or repair of necessary facilities, if it determines that there is probable cause to believe that inadequacies exist with respect to the energy grids developed by the electric utility industry, nothing in the subsection requires PSC approval for the transfer of ownership of electric facilities. As noted supra, when the Legislature has required PSC approval of the transfer of a utility, it has expressly stated so by statute, such as section 367.071, Florida Statutes, relating to the sale or transfer of water and wastewater system facilities.
Commission staff has also referred to the impact of PEF's obligation to serve section 366.03, Florida Statutes. The statute requires a public utility to furnish to each person applying therefor reasonably sufficient, adequate, and efficient service upon terms as required by the commission. The statute is not one made applicable to municipally owned and operated electric utilities by section 366.11, Florida Statutes, and therefore would appear to impose a responsibility on PEF to provide adequate and efficient service. However, I find nothing, in the statutes requiring the city to seek PSC approval for the transfer of the electric distribution system assets in the city from an investor-owned utility to the city.
Accordingly, I am of the opinion, based upon the information presented to this office, that the City of Winter Park is not required to seek the approval of the Public Service Commission for the transfer of the electric distribution system assets in the city from Progress Energy Florida, an investor-owned utility, to the city.
Sincerely,
Charlie Crist Attorney General
CC/tfl
[1] Cf. Florida Power Corp. v. City of Casselberry, 793 So.2d 1174
(Fla. 5th DCA 2001), upholding the validity of a purchase option in a franchise agreement which required that the valuation of the assets was to be set by "arbitration as may be provided by general law."
[2] While you acknowledge that agencies such as the Florida Department of Environmental Protection and the Florida Department of Community Affairs have jurisdiction over or statutory standing to comment upon the permitting and construction of electric power plants and transmission lines in excess of such capacities, you have advised this office that the transfer of electric distribution system facilities does not implicate such sections. See, e.g., s. 403.814(6), Fla. Stat., stating that maintenance of
existing electric lines and clearing of vegetation in wetlands conducted without the placement of structures in wetlands or other dredge and fill activities does not require an individual or general construction permit; s. 403.506(1), Fla. Stat., providing that no construction of any new electrical power plant or expansion in steam generating capacity of any existing electrical power plant may be undertaken after October 1, 1973, without first obtaining certification in the manner as provided therein; and s. 403.524(2), Fla. Stat., providing that no construction of any transmission line may be undertaken without first obtaining certification under this act. Rule 62-17.211(3), Fla. Admin. C., provides that
"[a] transfer of certification of all or part of a certified facility shall be initiated by the licensee's filing with the department and the parties a notice of intent to transfer certification to a new licensee. The notice of intent shall identify the intended new certification holder or licensee and the identity of the entity responsible for compliance with the certification. Parties shall have 30 days to file in writing with the department any objections to transfer of the certification. Upon the filing with the department of a written agreement from the intended new licensee to abide by all conditions of certification and applicable laws and regulations, the transfer shall be approved unless the department objects to the transfer on the grounds of the inability of the new licensee to comply with the conditions of certification, specifies in writing its reasons therefore, and gives notice and opportunity to petition for a Section 120.57, F.S., administrative hearing. A copy of the department's action on the transfer of certification shall be sent to all parties."
And see Rule 62-4.120, Fla. Admin. C., requiring that within 30 days after the sale or legal transfer of a permitted facility, an "Application for Transfer of Permit" be submitted to the Department of Environmental Protection and provides that the department shall approve the transfer of a permit unless it determines that the proposed new permittee cannot provide reasonable assurances that conditions of the permit will be met.
[3] See s. 366.04(2), Fla. Stat., which provides:
"In the exercise of its jurisdiction, the commission shall have power over electric utilities for the following purposes:
(a) To prescribe uniform systems and classifications of accounts.
(b) To prescribe a rate structure for all electric utilities.
(c) To require electric power conservation and reliability within a coordinated grid, for operational as well as emergency purposes.
(d) To approve territorial agreements between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. However, nothing in this chapter shall be construed to alter existing territorial agreements as between the parties to such agreements.
(e) To resolve, upon petition of a utility or on its own motion, any territorial dispute involving service areas between and among rural electric cooperatives, municipal electric utilities, and other electric utilities under its jurisdiction. In resolving territorial disputes, the commission may consider, but not be limited to consideration of, the ability of the utilities to expand services within their own capabilities and the nature of the area involved, including population, the degree of urbanization of the area, its proximity to other urban areas, and the present and reasonably foreseeable future requirements of the area for other utility services.
(f) To prescribe and require the filing of periodic reports and other data as may be reasonably available and as necessary to exercise its jurisdiction hereunder.
No provision of this chapter shall be construed or applied to impede, prevent, or prohibit any municipally owned electric utility system from distributing at retail electrical energy within its corporate limits, as such corporate limits exist on July 1, 1974; however, existing territorial agreements shall not be altered or abridged hereby."
And see s. 366.02(2), Fla. Stat., defining "Electric utility" as "any municipal electric utility, investor-owned electric utility, or rural electric cooperative which owns, maintains, or operates an electric generation, transmission, or distribution system within the state."Compare s. 366.02(1), Fla. Stat., which excludes from the definition of "Public utility" a municipality or any agency thereof.
[4] See s. 366.05(7) and (8), Fla. Stat., relating to the commission's authority to require reports from electric utilities to assure the development of adequate and reliable energy grids and to require the installation or repair of necessary facilities provided certain findings are made.
[5] See s. 366.051, Fla. Stat., authorizing the commission to establish guidelines relating to the purchase of power or energy by public utilities from cogenerators or small power producers and set rates at which a public utility must purchase power or energy from a cogenerator or small power producer.
[6] See s. 366.055, Fla. Stat., authorizing the commission to take such action as is necessary to assure that grid reliability and integrity are maintained, subject to certain limitations.
[7] Section 366.093, Fla. Stat., relates to access to utility records.
[8] Section 366.095, Fla. Stat., prescribes penalties for failure to comply with a lawful order or rule of PSC.
[9] Section 366.14, Fla. Stat., provides for the payment of regulatory assessment fees.
[10] 366.80 Short title._Sections 366.80—366.85 and 403.519 shall be known and may be cited as the "Florida Energy Efficiency and Conservation Act."
[11] See s. 367.071(1), Fla. Stat., which provides:
"(1) No utility shall sell, assign, or transfer its certificate of authorization, facilities or any portion thereof, or majority organizational control without determination and approval of the commission that the proposed sale, assignment, or transfer is in the public interest and that the buyer, assignee, or transferee will fulfill the commitments, obligations, and representations of the utility. However, a sale, assignment, or transfer of its certificate of authorization, facilities or any portion thereof, or majority organizational control may occur prior to commission approval if the contract for sale, assignment, or transfer is made contingent upon commission approval."
[12] 1987 Fla. PUC LEXIS 404 (1987).
[13] Cf. In Re: Request for acknowledgement of acquisition of AtlanticUtilities, 2002 Fla. PUC LEXIS 170 (2002) in which the commission acknowledged acquisition of Atlantic Utilities, a Florida Division of Southern Union Company d/b/a South Florida Natural Gas by Florida Public Utilities Company, and that Florida Public Utilities Company would continue to operate and serve the territory and customers utilizing the rates, rules, classifications, and regulations approved for South Florida Natural Gas by the Commission; In Re: Notice by Donovan Companies, Inc.,an Iowa corporation, of acquisition of assets of Southern Gas Company,formerly a division of Iowa Public Service Company, now to be known asSouthern Gas Company, a division of Donovan Companies, Inc., 1989 Fla. PUC LEXIS 1377 (1989).
[14] Cf. Florida Power Corp. v. City of Casselberry, supra, recognizing that while the commission may amend private contracts in some instances, the commission had not "been asked to approve rates, service, or territorial agreements. Moreover, the [Public Service Commission] has no jurisdiction over Casselberry at this time. Therefore, the trial court has proper jurisdiction of this case until such time as Casselberry becomes a retail electric utility or exercises its purchase option."
[15] See City of Cape Coral v. GAC Utilities, Inc., of Florida,281 So.2d 493 (Fla. 1973) (commission's powers, duties and authority are those and only those that are conferred expressly or impliedly by statute and any reasonable doubt as to the lawful existence of a particular power that is being exercised by the commission must be resolved against the exercise thereof); State, Department of Transportation v. Mayo,354 So.2d 359 (Fla. 1977) (any reasonable doubt as to existence of a particular power of Public Service Commission must be resolved against it).